METROPOLITAN LIFE INSURANCE COMPANY; the Equitable Life Assurance Society of the United States; the Mutual Benefit Life Insurance Company; Provident Life and Accident Insurance Company; Pacific Mutual Life Insurance Company; and Colonial Penn Franklin Insurance Company, Plaintiffs,

v.

BOARD OF DIRECTORS OF WISCONSIN INSURANCE SECURITY FUND; John Cleary, James Altman, Donald C. Ames, David Diercks, Thomas P. Fox, George A. Hardy, Stanley Hoffert, Charles P. Smith, James Stout, James Thomas, and Michael J. Tufts, individually and as members of the Board of Directors of Wisconsin Insurance Security Fund; and Thomas P. Fox, as Commissioner of Insurance of the State of Wisconsin, Defendants.

No. 83-C-604-C.

United States District Court,
W.D. Wisconsin.

Sept. 7, 1983.

the operation of the insurance security fund established by the Wisconsin legislature to provide a "mechanism for protecting insureds from excessive delay and loss in the event of liquidation of insurers." Wis. Stats. § 646.01(2)(a). Plaintiffs challenge the manner in which they have been assessed for the liquidation of the Reliable Life and Casualty Company and the manner in which the Wisconsin Insurance Security Fund Board has been paying the loss claims of Reliable's policyholders. They also attack the statutory requirement that payment of the assessments must be made before an assessed company can perfect an appeal under Wis.Stats. § 646.51(6). Plaintiffs contend that defendants have subjected them to the deprivation of their rights to due process under the Fourteenth Amendment.

Before plaintiffs moved for a preliminary injunction, defendants moved to dismiss or to stay, contending that the court should abstain from exercising jurisdiction on the ground, among others, that it would be disruptive of the State of Wisconsin's extensive effort in enforcing a complex and comprehensive administrative and judicial scheme regulating the insolvency of a domestic insurer. An evidentiary hearing on both motions was held on August 1 and 2, 1983. From the evidence adduced at that hearing and from the affidavits and depositions on file, I make the following findings of fact, for the purpose only of deciding the pending motions.

Robert Horowitz, Madison, Wis., for plaintiffs.

Gerald S. Wilcox, Asst. Atty. Gen., Madison, Wis., for defendant Fox.

Christopher Wilcox, Madison, Wis., for remaining defendants.

CRABB, District Judge.

This civil action for declaratory and injunctive relief is before the court on plaintiffs' motion for a preliminary injunction, and on defendants' motion to dismiss or to stay.

Plaintiff insurance companies are challenging the constitutionality of certain provisions of the Wisconsin statutes governing

## FACTS

Plaintiffs are insurance companies, each incorporated under the laws of, and having their principal places of business in, states other than Wisconsin. Each is licensed to do business in Wisconsin and each has done substantial insurance business in this state.

The defendant Board of Directors of the Wisconsin Insurance Security Fund is a board established by and existing under Wis.Stats. § 646.12, with capacity to sue and be sued and with the legal obligation of administering the Wisconsin Insurance Se-

curity Fund, a fund established by Wis. Stats. § 646.11.

Defendants Cleary, Altman, Ames, Diercks, Hardy, Hoffert, Smith, Stout, Thomas, and Tufts are members of the Wisconsin Insurance Security Fund Board. Each is a citizen of the State of Wisconsin, except Ames, who is a citizen of the State of Wisconsin or the State of Illinois.

Defendant Fox is a citizen of the State of Wisconsin. He is and has been at all relevant times since March 1, 1983, Commissioner of Insurance of the State of Wisconsin. As Commissioner of Insurance, he has the duty under Wis.Stats. § 601.41(1) of administering and enforcing all provisions of Wis.Stats. Chapter 646.

Reliable Life and Casualty Company was a Wisconsin corporation incorporated as a stock insurance company. It was licensed to do business in, and did business in, Wisconsin, thirty-four other states, and the District of Columbia.

On August 31, 1981, the Office of the Commissioner of Insurance for the State of Wisconsin began rehabilitation-liquidation proceedings with respect to Reliable in the Circuit Court of Dane County, Wisconsin. The case was assigned to the Honorable William C. Sachtjen, who has presided since March, 1975 as liquidation judge on various matters under Wis.Stats. Chapter 645.

The liquidation of Reliable is the first proceeding of its kind to have been brought under the present Wisconsin statutes, which were revised substantially in 1979. The sections of Wis.Stats. Chapters 645 and 646 which are challenged by plaintiffs have never been considered or construed by any Wisconsin appellate court. This liquidation is also the first in which insurance coverage has been continued. In this instance, the decision was made by the members of the Wisconsin Insurance Security Fund Board to provide continuing insurance coverage to persons who had bought guaranteed renewable disability insurance policies from Reliable, including those former Reliable policyholders whose policies had lapsed, if they reinstated their lapsed policies within thirty days of the notification of their right to reinstate.

To provide money to pay the loss claims of policyholders of Reliable and to continue insurance coverage to those policyholders, the Wisconsin Insurance Security Fund Board has imposed assessments pursuant to Wis.Stats. § 646.51 on the plaintiffs and other insurers licensed to do disability insurance business in Wisconsin. At a meeting held on December 4, 1981, the Wisconsin Insurance Security Fund Board determined the amount of assessment necessary to fund the continuing coverage. The Board ordered that the first installment of the assessment be in the total amount of $7,000,000. Each of the plaintiffs made timely payment to the Wisconsin Insurance Security Fund of its assessment.

After the Board determined the total amount of each of the two assessments necessary to operate, it calculated the assessments against each insurer using the two-step procedure specified by Wis.Stats. § 646.51(3)(b). In the first step, the apportionment among the states was made as follows: the assessments to provide protection under Wis.Stats. § 646.35 were made separately for each state in which Reliable was authorized to transact business. The assessment allocable to each state was in the proportion that the premiums Reliable received on business in each state on disability policies bore to the premiums it received in all such states. In the second step, the amount apportioned to each state was allocated as follows: assessments against the subject insurers were in the proportion that the premiums received on business in each state by each assessed insurer on the disability policies bore to such premiums received on such business in such state by all assessed insurers.

The result of this two-step procedure is that the plaintiffs and other assessed insurers have been assessed on the basis of the premium income they have received in Wisconsin and in states other than Wisconsin, for the purpose of paying general administrative expenses of the Wisconsin Insurance Security Fund attributable to the Reliable

liquidation and the loss claims, under Wis. Stats. § 646.31(2)(b), of Reliable policyholders who reside in Wisconsin and in states other than Wisconsin.

With the exception of certain calculations designed to eliminate trivial transactions or allocations, the Board of Directors of the Wisconsin Insurance Security Fund assessed the plaintiffs on their business in Wisconsin and the twenty-one other states in which Reliable did most of its business.

In calculating the assessments, the Wisconsin Insurance Security Fund Board did not ignore the business that Reliable was doing in states other than the twenty-two states in which the Board made assessments. The Board added that business to Reliable's Wisconsin business and thereby increased the assessed insurers' Wisconsin assessments. After performing the calculations described above, the results in isolated instances showed assessments by state or by company to be of such a small size that the resulting allocations or transactions were trivial, and accordingly the Board allocated such portion of the assessment to the State of Wisconsin.

The assessments of plaintiffs were as follows:

|  | Wisconsin | Other States | Total |
|---|---|---|---|
| Metropolitan | $38,584 | $151,098 | $189,682 |
| Equitable | 33,590 | 179,846 | 213,436 |
| Mutual Benefit | 8,818 | 50,548 | 59,366 |
| Provident | 7,525 | 62,458 | 69,983 |
| Pacific Mutual | 29,691 | 58,324 | 61,285 |
| Colonial Penn | 14,400 | 49,015 | 63,415 |

Each of the plaintiffs paid its assessment.

On May 31, 1983, the Board mailed to the plaintiffs and the other insurers licensed to do disability insurance business in the state of Wisconsin its notice of the second installment due on the assessment in the Reliable liquidation proceedings, in the amount of $3,500,000. The Board assessed the plaintiffs as follows:

|  | Wisconsin | Other States | Total |
|---|---|---|---|
| Metropolitan | $19,191 | $75,554 | $ 94,846 |
| Equitable | 16,795 | 89,922 | 106,717 |

|  | Wisconsin | Other States | Total |
|---|---|---|---|
| Mutual Benefit | $4,409 | $25,275 | $29,684 |
| Provident | 3,763 | 31,230 | 34,993 |
| Pacific Mutual | 1,481 | 29,159 | 30,640 |
| Colonial Penn | 7,200 | 24,509 | 31,709 |

Each of the plaintiffs paid its assessment.

Of the $10,500,000 that the Board assessed in 1982 and 1983 in the Reliable liquidation, only $2,714,765 (25.85%) was based on the insurers' business in Wisconsin. The balance of $7,785,235 (74.15%) was based on their business in other states.

Of the $20,744,029 that the Board paid out in loss claims from October 20, 1981 to September 30, 1982, only $2,779,108 (13.4%) went to residents of Wisconsin. The balance of $17,964,921 (86.6%) went to residents of other states.

If it is necessary to obtain more money to pay the loss claims and continue coverage, the Board may make additional assessments against the plaintiffs and other insurers. However, there is a reasonable probability that the Board will make no further assessments against the plaintiffs or other insurers in the Reliable liquidation proceedings. Because of premium rate increases implemented by the Board and other factors, the monthly operational deficit has been decreasing by approximately 80% to date, and has been projected to be eliminated entirely by further premium rate increases.

If the plaintiffs refuse to pay the assessments, the Commission may revoke the plaintiffs' licenses to do insurance business in Wisconsin and may impose other penalties.

As of March, 1982, there were about 42,-000 outstanding Reliable policies. About 80% of the holders of these policies were over 65 years old. About two-thirds of the policies provide supplements to Medicare; another large block of policies provides coverage for nursing home or skilled nursing care expenses. About 97% of the Reliable policies had a guaranteed renewable provision.

To provide for the administration of continuing coverage of the Reliable policyholders, the Board of Directors of the Wisconsin

Insurance Security Fund has arranged with the Mutual of Omaha insurance company to collect premium income and pay claims. Defendants had difficulty finding an entity willing to provide this service. Only three insurance carriers expressed any interest in handling the work and, of these three, only Mutual made a formal bid. Mutual's compensation is based upon premium income from renewals of Reliable policies.

Mutual obtains funding for its administrative expenses and for claim payments from two sources: premium income from policyholders, which is paid directly to Mutual, and the Reliable Segregated Account that is a part of the Wisconsin Insurance Security Fund. The Reliable Segregated Account derives its funds from the assessments imposed upon Reliable's competitors in Wisconsin, from advances from the Reliable Liquidation Account, and from the income produced by the short-term investment of excess funds. Payments from this account are made to Mutual as needed. Mutual has stated that it may decide to cancel its contract with the Board if plaintiffs prevail on their motion for a preliminary injunction.

The Reliable Liquidation Account is the liquidation estate. It consists of the assets of Reliable: generally real estate, securities, cash, the Reliable corporate charter, and causes of action. The account is under the supervision and control of the Commissioner of Insurance, who by law is the Liquidator of Reliable.

As of July 15, 1983, Mutual had about $570,000 in funds on hand for the payment of Reliable claims. As of August 1, 1983, the Reliable Segregated Account had a balance of about $2,000,000. If Mutual needed as much as $200,000 each month to cover its administrative costs and to make up the difference between premium income and claim payments, the Reliable Segregated Account would not show a deficit for a year.

At this time, the Reliable Liquidation Account has assets of about $1,500,000. It could lend $800,000 to $900,000 to the Reliable Segregated Account for as long as four months without difficulty.

If the Board of Directors of the Wisconsin Insurance Security Fund were enjoined from using the plaintiffs' assessments to pay the loss claims of nonresident policyholders, there would be sufficient funds in the Reliable Segregated Account and in the Mutual account to continue to pay such claims for some indeterminable length of time.[1] However, if all of the fifty insurers who have paid their assessments under protest were to obtain a similar injunction, only about $750,000 would remain available for the payment of lost claims and administrative costs. This sum would enable Mutual to continue paying claims on behalf of the Wisconsin Insurance Security Fund for only two to four months.

The manager of the Wisconsin Insurance Security Fund has inquired of the Fund's bank about the possibility of borrowing money on the commercial market and has been told that it is not a realistic possibility.

Wisconsin's insurance security laws are part of a nation-wide network providing separate state assessments made and administered by a single entity, and providing for the collection of premiums from policyholders residing in the subject states and the payment of claims to such policyholders. The assessments allocated to each state are roughly commensurate with the proven burden of paying claims of residents in most of the states.

There is no guarantee that money paid by the Board to Reliable policyholders or expended for administrative expenses will be recoverable by the plaintiffs from the poli-

---

1. Determining the length of time would require determining what percentage of the funds presently in the Mutual and Reliable Segregated Account was contributed by the plaintiffs, deducting that amount, and determining approximately how long the remaining funds would be sufficient to pay the anticipated deficit of $200,000 per month. I could calculate what percentage of the $3,500,000 assessment was contributed by plaintiffs (about 10.6%), but the record does not reveal what percentage of the funds now in the two accounts is attributable to assessments, rather than to premium income or investment income.

cyholders or from the Wisconsin Insurance Security Fund, but there is at least a reasonable probability of recovery. The Wisconsin Insurance Security Fund has a subrogated claim against the Reliable Liquidation Account for every claim paid by Mutual to a Reliable policyholder. Wis.Stats. § 646.33. The claim will remain a contingent one until such time as the Wisconsin Insurance Security Fund Board can determine a final, definite amount. The claim has a high priority against the Reliable Liquidation Account; only the costs of administration and wage claims of the former Reliable employees have a higher priority. Collection of the subrogation claim is dependent upon the success of the Reliable liquidator in marshalling assets.

Plaintiff Metropolitan appealed to the Board the amount of its March 15, 1982 assessment. All of the plaintiffs appealed to the Board the amount of their May 31, 1983 assessments. The appeal of the amount of the 1982 assessment by Metropolitan and the appeals of the amount of the 1983 assessment by all the plaintiffs are pending before the Board.

All of the appeals filed with the Board are part of the liquidation proceedings before the Liquidation Court, and are pending under the general supervisory jurisdiction of the Dane County Circuit Court, Case No. 81–CV–4554, pursuant to Wis.Stats. § 645.-04(3). In a related case decided by the Liquidation Court on February 18, 1983, involving the Reliable assessment appeal of Prudential Insurance Company of America, which is represented by the same lawyers who represent plaintiffs in this action, the Liquidation Court asserted jurisdiction over the assessment appeals filed before the Board, but merely stayed its proceedings pending final disposition by the Board. Relevant excerpts of that decision are as follows:

WHEREAS, ... Prudential has filed before the Fund's Board an appeal of its portion of such assessment...; and this Court has jurisdiction over any matter seeking relief which is incidental to or

relates to the above rehabilitation/liquidation proceedings;

\* \* \* \* \* \*

3. IT IS ORDERED in response to the defendants' Motion and in the exercise of this Court's discretion, that such grant is made on the further express condition that the appeal regarding the $200 deductible and the premium rate increases as set forth more fully in the First Claim and the Third Claim of the proposed Complaint shall be heard and decided by the Fund Board as soon as practicable, and that this Court shall not exercise its jurisdiction in such regard while such issues are pending before the Fund Board.

4. IT IS FURTHER ORDERED that ... all related matters hereby are stayed with respect to these judicial proceedings while such issues are pending before the Fund Board.

The Board has adopted rules entitled "Assessment Appeal and Review Procedures." It did so without following the rule-making requirements of Wis.Stats. Chapter 227, because it is not a state agency and is therefore exempt from the rule-making provisions of Chapter 227.

The Board's rules state in part:

An insurer may appeal a Chapter 646 assessment to the Board by filing its objection within 10 days after receipt of the Statement under Wis.Stats. § 646.51(5). An appeal shall be deemed to have been perfected if within 10 days after the date of such receipt the written appeal has been received by an administrative agent or employee designated by the Fund for the subject liquidation, or by any current member of the Fund's Board; and if when due such insurer has paid in full each assessment or installment thereof as designated by the Board. If an appeal is not perfected, an insurer may not further object to or appeal the assessment. These appeal and review procedures are the exclusive means of challenging the assessment relating to the subject liquidation, under the provisions of Wis.Stats. Chapter 646, § 645.04(3), § 645.05, and § 76.68.

Under the Board's procedures, within sixty days from the mailing of the final decision of the Board and the notice of the party's right to seek judicial review before the Liquidation Court, any appealing insurer may file objections to the Board's decision with the Liquidation Court. An appeal from an adverse decision of the Liquidation Court may be taken to the court of appeals, Wis.Stats. § 808.03, and from there to the state supreme court by petition for review, Wis.Stats. § 809.62.

The Special Internal Procedural Rules adopted by the Board include the following provision:

4. In the event that one of the issues in the hearing relates to a challenge to the constitutionality of relevant statutes, or to another similar issue, all evidence relevant to such issues and otherwise admissible shall be admitted for purposes of establishing a complete record for any possible judicial review; however, the Fund Board in rendering its final decision shall refrain from issuing any decision on such constitutional challenges or on other similar issues not permitted under law.

During assessment appeals, the Board continues to spend the money obtained in the assessments by paying loss claims as they are made and by paying administrative expenses as they are incurred. Such payments are made only to the extent that operational deficits may continue. The operational deficits have been caused by the difference between the filed claims and administrative expenses as compared to income from the premiums paid by policyholders throughout the United States and the investment income earned by the Fund on temporarily unneeded assets.

The Board has been paying loss claims of, and providing continued insurance coverage to, policyholders of Reliable disability insurance pursuant to Wis.Stats. §§ 646.31 and 646.35(2). Pursuant to an order of the Liquidation Court dated January 20, 1982, the Board has paid these claims without deducting either $200.00 or $50.00. Wis.Stats. § 646.31(3) provides that "Payment under this chapter is limited to the amount by which the claim exceeds $200. Claims may not be aggregated by assignment or otherwise for application of this deductible." Wis.Stats. § 645.68 provides that the first $50 of the amount allowed on each claim under policies for losses incurred shall be deducted from the claim and included in the class under Wis.Stats. § 645.68(8).

The average claim payment under Reliable policies through February 1982 was less than $300 per claim, exclusive of the credit life, credit accident and health business, group claims payments, and nursing home payments.

There is no statute or rule providing for a refund if the plaintiffs win; however, with respect to all assessments which are not expended because of elimination of the operational deficit, or which have been expended but are recovered by the Board under the subrogation claim rights contained in Wis.Stats. § 646.33 and under its right to early payment of liquidation monies to security funds under Wis.Stats. § 645.72(2), there does exist a statute providing for refund to the plaintiffs. Wis.Stats. § 646.61 provides for distributions to assessed insurers of money not needed for the coverage obligations under Chapter 646. In addition, Wis.Stats. § 646.51(7) expressly permits the plaintiffs to recoup assessments by an increase in insurance premium rates. None of the plaintiffs has filed a request for a rate increase since it has been assessed for the Reliable liquidation. It is not clear whether under this statute an insurer may raise its rates sufficiently to cover its total assessment or whether any rate increase is limited to an amount sufficient to pay only that portion of the insurer's assessment which is attributable to business done in Wisconsin.

Neither Blue Shield nor Wisconsin Physicians Service has been assessed for the Reliable liquidation. If plaintiffs were to obtain approval of a rate increase and implement it, it might affect their ability to compete effectively against these two large disability insurers.

In addition to permitting rate increases, the Wisconsin Statutes provide for an off-

set of assessments against premium taxes, but only for the amount of the assessment attributable to business done in Wisconsin, and only "[i]f the premium rates on a class of business are fixed, so that it is not possible for the insurer to recoup its assessments by increasing the premium rates on the class of business." Wis.Stats. § 646.51.

If a non-resident Reliable policyholder had a loss claim that was not paid by Mutual for any reason, the policyholder would have a claim against the insurance guaranty fund of his or her own state. If that fund refused to honor the claim, or if the policyholder lived in one of the twenty states which do not have guaranty funds, he or she would have a claim against the Reliable Liquidation Account. Such a claim would not be paid until completion of the liquidation proceedings, an event which is not expected to occur before 1988.

## OPINION

The threshold question is whether this court should abstain from exercising jurisdiction in this case. Defendants concede that the court has subject matter jurisdiction: the plaintiffs' citizenship is diverse from that of defendants' and, in addition, plaintiffs are raising a federal question and alleging a violation of their civil rights under 42 U.S.C. § 1983. Jurisdiction exists under 28 U.S.C. §§ 1331, 1332, and 1343(3).

In arguing that the court should defer to the state courts, defendants rely on four separate prongs of the abstention doctrine characterized as *Pullman, Younger, Colorado River,* and *Burford.* I will consider each of these in turn.

### A. *Pullman Abstention*

In *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), the Supreme Court directed the federal district court to stay its proceedings to allow the Texas courts to determine the scope and meaning of an allegedly unconstitutional order of the railroad commission. The Court found decisive its regard for the rightful independence of the state courts, the smooth working of the federal judici-

ary, and the furtherance of harmonious relations between state and federal authorities. It held it a waste of resources for the federal court to issue a tentative answer to a constitutional challenge of a state agency order, when a state adjudication might displace that answer "tomorrow." *Id.* at 500, 61 S.Ct. at 645. The general rule derived from *Pullman* is that abstention is justified "in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law." *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959).

It is clear that *Pullman* abstention has no application in this case. There is no federal constitutional issue which would be affected by a determination of state law. There is no ambiguity in the statutory language authorizing defendants to assess plaintiffs on the basis of their out-of-state income and to pay the claims of non-resident policyholders and the only unresolved state law issue is the legality of the defendants' decision to pay all valid claims of Reliable policyholders without applying either the $200 or $50 deductibles prescribed under the statutory scheme. Determination of that question would not affect the posture or importance of the federal constitutional claims raised by plaintiffs.

### B. *Younger Abstention*

Under the holding in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), federal courts are required to abstain in any case in which federal jurisdiction is invoked to restrain state criminal proceedings and there is no showing of bad faith, harassment, or a patently invalid state statute. The doctrine has been extended to some civil proceedings, "more akin to a criminal proceeding than are most civil cases," *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 604, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482 (1975). In *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), for example, the Supreme Court reversed the grant of a federal court injunction against

implementation of New York's statutory contempt procedure; in *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482, the Court reversed the grant of an injunction restraining a state court's application of Ohio's nuisance law to a movie theater that had been showing pornographic movies.

"*Younger* and similar cases are based on a desire not to interfere with a state's sovereign functions." *Board of Education of Valley View Community Unit School District v. Bosworth,* 713 F.2d 1316 at 1320 (7th Cir.1983).

> [I]n a union where both the States and the Federal Government are sovereign entities, there are basic concerns of federalism which counsel against interference by federal courts, through injunctions or otherwise, with legitimate state functions, particularly with the operation of state courts.

*Trainor v. Hernandez,* 431 U.S. 434, 441, 97 S.Ct. 1911, 1916, 52 L.Ed.2d 486 (1977). In *Trainor,* the Supreme Court held that, pursuant to *Younger,* the district court should have declined to issue an injunction against the efforts of the State of Illinois to collect wrongfully received welfare payments by executing writs of attachments against property of welfare recipients without affording them notice or a hearing.

It is not clear that the case before the court would be governed by *Younger.* Certainly, the ongoing state proceedings are not criminal proceedings, or akin to criminal proceedings, or even in aid of criminal proceedings. They are not even judicial proceedings at this stage, only administrative hearings conducted under the general supervision of the Liquidation Court. On the other hand, it can be argued that the case is controlled by *Younger,* because the liquidation of an insurance carrier pursuant to Chapter 645 and the continuation of coverage as an integral part of the liquidation procedure are sovereign functions carried out in accordance with a carefully conceived, unitary statutory scheme under the auspices of a state court, with full and fair opportunity in the state courts for judicial review of federal constitutional claims. *See Middlesex County Ethics Committee v. Garden State Bar Assoc.,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (federal district court required to abstain from hearing a federal constitutional challenge to the proceedings conducted by a local ethics committee pursuant to rules promulgated by the New Jersey Supreme Court for the regulation of lawyers).

■ That the state courts provide a full opportunity for review of federal constitutional claims is apparent from the statutory scheme and the Board's own internal rules. Assessment appeals are part of the liquidation proceedings pending under the general supervisory jurisdiction of the Liquidation Court. Under the procedures established by the Board, any insurer has the opportunity to have its appeal heard by the Board and reviewed by the Liquidation Court. Although the Board cannot rule on any constitutional challenge to the statutes under which it operates, it may rule on the constitutionality of the application of such statutes, *Nodell Investment Corp. v. Glendale,* 78 Wis.2d 416, 426, 254 N.W.2d 310 (1977) and, further, is directed to receive all evidence relevant to any such challenge "for purposes of establishing a complete record for any possible judicial review." This procedure gives plaintiffs an opportunity to raise all of their claims for determination, either by the Board or by the state circuit court acting as the Liquidation Court.

The essential fairness of the state court proceedings is not impaired, as plaintiffs contend, by either the prerequisite that plaintiffs pay their assessments in full before appealing or the Liquidation Court's prior ruling on the validity of ignoring the deductibles in the payment of claims. One adverse ruling on a preliminary matter does not demonstrate the kind of bias that could be said to deprive plaintiffs of a fair hearing, and neither does the prepayment requirement.

> Where ... adequate opportunity is afforded for a later judicial determination of the legal rights, summary proceedings

to secure prompt performance of pecuniary obligations to the government has been consistently sustained ... Property rights must yield provisionally to governmental need.

*Phillips v. Commissioner of Internal Revenue,* 283 U.S. 589, 595, 51 S.Ct. 608, 611, 75 L.Ed. 1289 (1931) (citations omitted). *See also B & M Coal Corp. v. Office of Surface Mining Reclamation & Enforcement,* 699 F.2d 381 (7th Cir.1983) (governmental interest in effective collection of civil penalties for alleged mining violations by requiring prepayment of penalty into escrow account outweighs private interest in having the use of the penalty money until after there has been a judicial determination of the violation); *Bomher v. Reagan,* 522 F.2d 1201 (9th Cir.1975) (California law providing for summary tax collection procedures with provision for subsequent judicial review upheld against federal constitutional challenge).

Whatever questions remain about the applicability of *Younger* to this case, at the least the principle of comity emphasized in *Younger* counsels caution in determining whether to intervene in pending state proceedings such as these, which have been brought by the state Commissioner of Insurance to implement the state's statutory plan for the protection of policyholders and the maintenance of public confidence in the insurance industry. *See Mathias v. Lennon,* 474 F.Supp. 949, 956 (S.D.N.Y.1979).

### C. Colorado River "Abstention"

Under the holding in *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), deferral to state court proceedings may be justifiable in certain circumstances that do not fall within any traditional category of abstention. As the opinion in that case makes clear, such circumstances "are considerably more limited than the circumstances appropriate for abstention." *Id.* at 818, 96 S.Ct. at 1246.

*Colorado River* began as a suit brought by the United States in federal district court in Colorado, seeking declaration of the government's rights to waters in certain rivers located in one of Colorado's seven Water Divisions, which each encompass one or more entire drainage basins for the larger rivers in the state. The district court dismissed the suit, stating that the doctrine of abstention required deference to the state court proceedings in the Water Division. The Supreme Court affirmed, holding, however, that the suit implicated none of the policies supporting abstention set out in *Pullman, Burford,* or *Younger.* The Court noted that despite "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," *id.* at 817, 96 S.Ct. at 1246, citing *England v. Medical Examiners,* 375 U.S. 411, 415, 84 S.Ct. 461, 464, 11 L.Ed.2d 440 (1964), under certain exceptional circumstances, a federal court may dismiss a federal suit on the ground that a concurrent state proceeding is pending.

One of the circumstances noted by the court is that in which the court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other courts. *See, e.g., Princess Lida v. Thompson,* 305 U.S. 456, 466, 59 S.Ct. 275, 280, 83 L.Ed. 285 (1939):

> [T]he principle applicable to both federal and state courts that the court first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion of the other, is not restricted to cases where property has been actually seized under judicial process before a second suit is instituted, but applies as well where suits are brought to marshal assets, administer trusts, or liquidate estates, and in suits of a similar nature where, to give effect to its jurisdiction, the court must control the property.

A federal court may also "consider such factors as the inconvenience of the federal forum; the desirability of avoiding piecemeal litigation; and the order in which jurisdiction was obtained by the concurrent jurisdictions." *Colorado River,* 424 U.S. at 818, 96 S.Ct. at 1247 (citations omitted).

In *Colorado River,* the factors counseling against duplicative federal proceedings in-

cluded: (1) the clear federal policy against piecemeal litigation of water rights in a river system as evidenced by the McCarran Amendment (also known as the McCarran Water Rights Suit Act, 43 U.S.C. § 666);[2] (2) the adequacy of the system established under the Colorado Water Right Determination and Administration Act (Colo.Rev. Stat.Ann. § 37–92–101 *et seq.* (1974)) for adjudication and management of rights to the use of the state's waters; (3) the apparent absence of any proceedings in federal district court other than the filing of the complaint; (4) the extensive involvement of state water rights occasioned by the suit, which named one thousand defendants; (5) the distance to the federal court in Denver; and (6) the existing participation by the United States in proceedings involving other Colorado Water Divisions.

Whether the particular facts of *Colorado River* dictate a similar result in this case is not certain and not necessarily important. What is of significance to this case is the Court's explicit recognition of the longstanding policy set out in *Princess Lida,* 305 U.S. 456, 59 S.Ct. 275, 83 L.Ed. 285, permitting exclusive jurisdiction by the court first asserting jurisdiction over property. This policy has been held to encompass liquidations of insolvent corporations, including insurance corporations. *See, e.g., Pennsylvania v. Williams,* 294 U.S. 176, 55 S.Ct. 380, 79 L.Ed. 841 (1935); *Department of Financial Institutions of Indiana v. Mercantile Commerce Bank & Trust Co.,* 92 F.2d 639 (7th Cir.1937). The policy derives from necessity:

> Experience has demonstrated that, in order to secure an economical, efficient, and orderly liquidation and distribution of the assets of an insolvent corporation for the benefit of all creditors and stockholders, it is essential that the title, custody, and control of the assets be entrusted to a single management under the supervision of one court. Hence other courts, except when called upon by the court of primary jurisdiction for assistance, are excluded

from participation. This should be particularly true as to proceedings for the liquidation of insolvent insurance companies. . . ."
*Motlow v. Southern Holding & Securities Corp.,* 95 F.2d 721, 725–26 (8th Cir.1938). *See also Penn General Casualty Co. v. Pennsylvania,* 294 U.S. 189, 55 S.Ct. 386, 79 L.Ed. 850 (1935).

■ Not every federal action relating to a state liquidation proceeding is barred by the pendency of such a proceeding. An action that is strictly *in personam,* that is, one seeking an adjudication of *rights* in property, rather than a direct *distribution* of the property, may proceed in a federal court having concurrent jurisdiction, "at least until judgment is obtained in one court which may be set up as *res adjudicata* in the other." *Penn General Casualty Co. v. Pennsylvania,* 294 U.S. at 195, 55 S.Ct. at 389.

Plaintiffs contend that this action is another exception. In their view, the Board's decision to utilize the Wisconsin Insurance Security Fund to provide continuing coverage to the Reliable policyholders pursuant to Wis.Stats. Chapter 646 is a matter wholly distinct from the liquidation proceedings pending in state court under Wis.Stats. Chapter 645, and, therefore, their *in personam* action against the Board's directors may proceed because it will have no effect upon the liquidation itself.

■ The distinction plaintiffs try to make is not supported by a review of the statutes at issue. Far from being distinct from the liquidation proceedings, the operation of the Wisconsin Insurance Security Fund is an integral part of the statutory scheme for the rehabilitation and liquidation of defaulting Wisconsin insurance companies. *See* Wis.Stats. §. 646.73: "This chapter applies in full to all liquidations commenced after February 16, 1980." *See also* § 645.46, Powers of Liquidator:

**2.** The McCarran Amendment permits the United States to be joined as a defendant in any suit for the adjudication or administration of rights

to the use of water of a river system where the United States is a necessary party.

Subject to the court's control, the liquidator may: ... (8) <u>Cooperate with the fund created under ch. 646</u> in using assets of the estate to transfer policy obligations to a solid assuming insurer, if the transfer can be arranged without prejudice to applicable priorities under § 645.68.

(underlined portion added by amendment in 1979, effective Feb. 16, 1980).

The purposes of Chapter 646 are clearly related to the liquidation proceedings in Chapter 645. As noted, those purposes are: "To maintain public confidence in the promises of insurers by providing a mechanism for protecting insureds from excessive delay and loss in the event of liquidation of insurers and by assessing the cost of such protection among insurers...." § 646.01(2)(a), Wis.Stats. As the 1979 Prefatory Committee Comment provides, one of the more important of the recent changes was the transfer of the liquidation task of adjusting loss claims to the Board. "This entire process," the drafters conclude, "is an integral part of the regulatory scheme." Wis.Stats. Ann. Chapter 646 (West), (Supp.), "Committee Comment—1979" at 59. Not only do the plaintiffs' challenges actually go "to the heart of the actual liquidation process," but the assessment process they challenge in their *in personam* suit against the directors is at the heart of the ability of the Board to carry out its statutory obligations with respect to liquidation.

■ Although plaintiffs' complaint is brought *in personam,* rather than *in rem,* and is directed to the Reliable Segregated Account, the consequences of the filing are no different. Whether plaintiffs' suit is essentially against the segregated account (because the obvious result of a ruling in plaintiffs' favor will be to reduce the amounts in the segregated account available for use for the payment of disability insurance claims), and thus an *in rem* proceeding, or whether the suit is viewed as an *in personam* action which interferes with the state court's *in rem* liquidation proceedings, the result is the same: this court must defer to the state court proceedings to avoid the "unseemly and disastrous conflicts" that would arise if this court were to issue rulings that reduced the funding in the account and thereby defeated that part of the state's liquidation efforts which involves the provision of continuing coverage to holders of Reliable disability insurance policies.

Despite plaintiffs' efforts to distinguish the management of the Liquidation Account (essentially the marshalling of assets) from the management of the Reliable Segregated Account (essentially imposing and collecting assessments from Wisconsin disability insurance carriers), the fact is that in both instances the state is managing a fund whose integrity and viability would be jeopardized by the possibility of conflicting adjudications in different forums.

Plaintiffs have attempted to show that an embargo on the use of only their assessments would have a minimal impact on the Board's ability to provide continuing disability coverage to the Reliable policyholders, but their efforts are unpersuasive. There is no reason to think that if plaintiffs were successful in this action the remaining 44 protesting insurers would not seek the same relief. If they did, the Board would be left with only enough money to pay the claims of non-resident policyholders for two to four months. Even the loss of only the plaintiffs' funds would impair the defendants' ability to continue claim payments. Moreover, if the assessment procedures were held to be invalid, surely the other insurers would resist any efforts by defendants to impose and collect assessments from them to make up for the loss of the funds from plaintiffs.

Plaintiffs suggest the Board could borrow from the Reliable Liquidation Account or from a commercial lender, but the suggestion does not withstand scrutiny. The Board has no assets and, if its assessment procedures were under attack, it would have no way of assuring a lender of its ability to repay a loan.

Any impairment of the Board's ability to provide for the prompt payment of the valid claims of the Reliable policyholders would have a direct, adverse effect upon

the policyholders' willingness to renew their policies. The consequent loss of premium income would further reduce funds available to pay claims and would affect Mutual's willingness to continue to administer the program.

I conclude that as in *Colorado River,* exceptional circumstances exist in this case. The orderly administration of justice and the prevention of unseemly conflicts between courts require this court to defer to the state courts in the determination of the constitutional and statutory claims raised by plaintiffs.

### D.  Burford Abstention

The principles announced in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), support the conclusion that this case should be dismissed out of deference to the state court liquidation proceedings. In *Burford,* the Supreme Court ordered abstention in a case in which, unlike *Pullman,* there was no unclear issue of state law, and no attempt to rest the decision on avoidance of a federal constitutional issue and, in which, unlike *Younger,* no attempt to enjoin a state criminal proceeding. What was present were these factors: the public importance of uniform administration of a complex scheme to achieve fair production of oil and gas in the East Texas oil field; the specialized knowledge of the supervising Commission and the single reviewing court; and the concern that inefficient regulation of the field could lead to the waste of one of the state's great natural resources.[3]

The Supreme Court noted that, in 1919, the State of Texas had devised a complex regulatory procedure to control the flow of oil, meet market demand, protect the individual operators, and serve the public interest. Among its provisions was a rule that required a minimum spacing between wells, but also allowed exceptions "where necessary 'to prevent waste or to prevent the

confiscation of property.' " *Id.* at 322, 63 S.Ct. at 1101. "[S]ound respect for the independence of state action" persuaded the court to uphold the district court's dismissal of the federal court action brought by Sun Oil, attacking on due process grounds the constitutionality of a state order granting Burford a permit to drill four wells. The Court concluded that review by a federal court of the reasonableness of a particular grant or denial of a permit would have an impermissibly disruptive effect on the Texas scheme for regulation and management of the oil field.

It is difficult to distill a clear guide for abstention from *Burford* and the cases that have relied upon it. For example, the decision in *Alabama Public Service Commission v. Southern Railway Co.,* 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951) could be read as holding that federal courts must abstain in all cases involving state regulatory actions. In that case, the Court held that a federal court could not review a state regulatory commission's denial of the railroad's request to discontinue certain passenger service. The Court referred to the availability of state court review, the predominantly local factors involved, and the desire to avoid needless friction with state courts. Other courts have followed the holding in *Alabama Public Service Commission* to abstain in matters of state regulation, *see, e.g., Kelly Services, Inc. v. Johnson,* 542 F.2d 31 (7th Cir.1976), but the Supreme Court's failure to rely on it in deciding *Colorado River* raises doubts about the continuing vitality of that holding.

Professor Moore classifies *Burford* in a category of cases of "uncertain scope" which he calls the predominant state interest exception. In this latter category, he places both *Burford* and *Colorado River,* as well as other cases that "do not purport to establish a rule of general applicability." *See, e.g., Louisiana Power & Light v. Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959) (abstention upheld where case

---

**3.** The chief forces causing oil to move are gas and water. If the gas and water pressures in an oil pool or field are not maintained at a level which will force the oil through wells to the

surface, the oil can be lost irretrievably. Fear of losing the vast East Texas resources through wasteful, unplanned drilling led to the state's development of regulated drilling.

concerned state's eminent domain powers and an unsettled question of state law involving the extent of the state's delegation to the city of its eminent domain power); *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959) (Supreme Court rejected idea that eminent domain powers are of special state concern; district court should not have dismissed action challenging legality of county eminent domain proceeding where state law was clear on the issue raised by the challenger). 1A, Part 2, Moore's Federal Practice, ¶ 0.203[2] (1982). In Professor Moore's opinion, the critical prerequisite for application of *Burford* abstention is the one spelled out by the Supreme Court in *Colorado River* in its discussion of *Burford:* the finding that federal adjudication would "be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colorado River,* 424 U.S. at 814, 96 S.Ct. at 1245.

Obviously, "disruptive" connotes something more than mere intervention in a matter of state policy. "[T]here is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy." *Zablocki v. Redhail,* 434 U.S. 374, 379–80 n. 5, 98 S.Ct. 673, 677–678 n. 5, 54 L.Ed.2d 618 (1977). What the Supreme Court considers disruptive can be inferred indirectly from its refusal to apply *Burford* abstention to *Colorado River* because the case did not involve claims of unsettled state law or questions bearing on state policy, because a federal court decision on the state claims would not impair efforts to implement state policy, because the "mere potential for conflict in the results of adjudications" did not warrant a stay of federal jurisdiction, and finally, because the exercise of federal jurisdiction would not "impair impermissibly the state's effort to effect its policy respecting the allocation of state waters" or "interrupt any such efforts by restraining the exercise of authority vested in state officers." *Id.* 424 U.S. at 815–16, 96 S.Ct. at 1245.

■ In contrast to *Colorado River,* the instant case involves unsettled questions of state law (which is not to say that the state law questions are of such a nature as to make *Pullman* abstention proper) and it presents for decision questions bearing on state policy. Moreover, a decision by this court of the state claims could impede efforts to implement the state policy expressed in Wis.Stats. § 646.01(2)(a) and the very exercise of federal jurisdiction will interrupt the state's efforts to effect its policy respecting the liquidation and rehabilitation of Wisconsin insurance companies and the concomitant protection of policyholders. Indeed, the potential for conflict in the results of federal and state court adjudication could bring to a halt the state's efforts in this respect. It is a matter of substantial state concern that the process of liquidating an insurance company be carried out in an orderly and efficient manner, so as to protect the interests of the company's owners, policyholders, and creditors, as well as the public. *Blackhawk Heating & Plumbing Co., Inc. v. Geeslin,* 530 F.2d 154 (7th Cir.1976); *In re Liquidation of All Star Insurance Corp.,* 484 F.Supp. 623 (E.D.Wis. 1980); *Mathias v. Lennon,* 474 F.Supp. 949.

I conclude that *Burford* requires abstention in this case to permit resolution of plaintiffs' claims through the available state mechanisms.

■ The fact that plaintiffs have included in their complaint a claim under 42 U.S.C. § 1983 does not affect the decision to abstain. Abstention is not the equivalent of exhaustion of state court remedies, a requirement that cannot be imposed upon § 1983 claims. *Patsy v. Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) (White, J., concurring).

### ORDER

Deferral to the state courts under either *Burford* or *Colorado River* requires dismissal of the complaint rather than a stay of the federal action pending a determination by the state courts. Therefore, IT IS OR-

DERED that defendants' motion to dismiss this action is GRANTED.[4]

---

**4.** With the dismissal of the case, obviously I cannot reach plaintiff's motion for preliminary injunction.