864 F.2d 1033
 57 USLW 2410
 LAC D'AMIANTE DU QUEBEC, LTEE, a corporation of the State of
Delaware, Appellee
v.
AMERICAN HOME ASSURANCE COMPANY, a corporation of the State
of New York, Highlands Insurance Company, a corporation of
the State of Texas, Midland Insurance Company, a corporation
of the State of New York.
Appeal of MIDLAND INSURANCE COMPANY.
 Nos. 87-5249, 87-5380 and 87-5401.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 19, 1988.
Decided Dec. 28, 1988.
 
 John G. Buchanan, III (argued), Richard A. Friedman, Covington & Burling, Washington, D.C., Myron J. Bromberg, Porzio, Bromberg & Newman, P.C., Morristown, N.J., for appellee, Lac D'Amiante Du Quebec, Ltee.
 Jerome M. Lynes (argued), Connell, Foley & Geiser, Roseland, N.J., for appellee, Highlands Ins. Co.
 Edwin R. Scherlis (argued), Melvin R. Shuster, Margolis, Edelstein, Scherlis, Sarowitz & Kraemer, Philadelphia, Pa., for appellant, American Home Assur. Co.
 Herbert Rubin (argued), David B. Hamm, Herzfeld & Rubin, P.CV., New York City, Laurence M. McHeffey, Hamlon, McHeffey, Herzfeld & Rubin, Edison, N.J., for appellant, Midland Ins. Co.
 Before HIGGINBOTHAM and BECKER, Circuit Judges and SHAPIRO, District Judge.*
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This appeal arises from a civil action in the district court for the District of New Jersey by a seller of asbestos against its insurers seeking indemnity for sums it has paid out in connection with asbestos related claims against it. The district court resolved a number of complex contractual issues, including the highly controversial and unsettled question whether exposure, manifestation or some combination thereof is the triggering event for insurance coverage. It thereupon made a liability determination and fixed the amount of damages with respect to the defendant insurers, including Midland Insurance Company ("Midland"), notwithstanding that a New York Court, pursuant to New York's Uniform Insurers Liquidation Act, had ordered Midland into liquidation proceedings and had appointed the New York Superintendent of Insurance as its statutory receiver.
 
 
 2
 Shortly after the onset of the district court proceedings, Midland moved to dismiss or stay the action against it on the ground that the federal court should abstain in favor of the New York liquidation proceedings. The district court denied the motion. The threshold (and ultimately dispositive) question on this appeal (Midland is the sole remaining defendant, the other insurers having settled) is whether the district court erred in so doing. More precisely, the question is whether the court should have abstained under the doctrine of Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), to avoid disruption to an important, complex state regulatory system (which we discuss at length below). For the reasons that follow we believe that the court should have done so; hence we vacate and remand with directions to dismiss the action.
 
 I. FACTS AND PROCEDURAL HISTORY
 
 3
 Appellee Lac D'Amiante du Quebec ("LAQ"), a Delaware Corporation with its principal place of business in Quebec, Canada, has mined, milled, and sold asbestos since 1958. LAQ has faced and will continue to face lawsuits for injuries caused by asbestos that LAQ has produced and distributed to various manufacturers for the manufacturers' use or for sale to third parties.[1] LAQ sought declaratory and monetary relief in the district court based on third party indemnity policies underwritten by American Home Assurance Company ("AHAC"), Highlands Insurance Company ("Highlands"), and Midland. Jurisdiction was based on diversity of citizenship.
 
 
 4
 LAQ's insurance is best analyzed as three successive tiers of protection, each of which must be exhausted before the next is tapped. The first is LAQ's primary coverage, which was provided by the Canadian General Insurance Company ("Canadian General") from 1962 to 1976 and by LAQ as self-insurer from 1976 to 1984. This primary coverage rose from $50,000 in 1962 to $3,000,000 in 1984. Starting on March 15, 1975, LAQ obtained secondary coverage from AHAC to insure against liability in excess of that covered by LAQ's primary coverage but below a higher annual aggregate limit, which changed from year to year as LAQ and AHAC renegotiated the contract. On March 15, 1975, LAQ also acquired $20 million of tertiary coverage from Highlands to insure against liability in excess of that covered by its primary and secondary insurance. Midland replaced Highlands as tertiary insurer on April 29, 1975 and continued to provide tertiary coverage to LAQ until March 15, 1978. Midland's annual aggregate limit varied during this period, at one point exceeding $30 million.
 
 
 5
 The Highlands and Midland policies are "form following excess policies" that, unless otherwise provided, incorporate and follow the operative provisions of the AHAC policies. The parties stipulated before the district court that the operative provisions of each of the policies are identical and do not differ in any significant respect from the provisions of the standard Comprehensive General Liability policies widely used in the insurance industry.
 
 
 6
 LAQ sued AHAC, Highlands, and Midland for indemnification for asbestos property and personal injury claims.[2] Because of the nature of the diseases caused by asbestos, the injuries now manifesting themselves in the 1980s derived from exposure to asbestos much earlier. The asbestos fibers entered the lungs of people exposed to it and immediately started to cause damage, but that damage was subclinical and therefore difficult to diagnose until years later.[3] Similarly, asbestos installed in buildings years ago emitted fibers into the atmosphere, damaging the environment of the building. Substantial injury to property occurred because of the loss of value of the asbestos-contaminated property and the cost of asbestos removal.
 
 
 7
 LAQ sued each of the three insurance companies on a breach of contract theory. LAQ contended that the insurance companies were obligated to indemnify LAQ for claims against it if they provided insurance to LAQ at any time between the injured parties' initial exposure to asbestos and the final manifestation of asbestos injury. Under this approach, LAQ was entitled to select any one year period in between the two benchmarks of exposure and manifestation and thereby trigger the various policies for that year. Once LAQ's self-insurance limit was depleted, LAQ would be entitled to indemnification from its secondary insurer and then from its tertiary insurer. Under LAQ's theory, the fact that an insurer had not insured LAQ either at the time of exposure or at the time of manifestation was irrelevant; to be held liable to the limits of its policy ceiling the insurer merely had to have provided insurance to LAQ during some portion of the one year period that LAQ chose. The insurance companies rejoined that they were required to indemnify LAQ for asbestos injuries only if their policies provided third party coverage to indemnify LAQ at the time of asbestos exposure, and that even if their liability were greater, LAQ's interpretation of the contracts was overbroad.
 
 
 8
 In its July 31, 1985 opinion addressing summary judgment motions on various issues, the district court resolved much of the dispute over the proper construction of the insurance contracts. See Lac D'Amiante du Quebec v. American Home Assurance Co., 613 F.Supp. 1549 (D.N.J.1985). Applying New Jersey law, the district court agreed with LAQ that under the liability insurance provided by the defendants, coverage for asbestos-related settlement or judgment is triggered continuously from the time of exposure to the time of manifestation.[4] The district court held that this continuous trigger applied to property damage as well as personal injury under the insurance policies.[5] Furthermore, it held that each insurer was jointly and severally liable, and that the continuous trigger applied to indemnification for defense costs as well as third party claims. Pursuant to the court's July 31, 1985 opinion, LAQ elected to select the period March 15, 1975 to March 15, 1976, thereby triggering the various insurance policies that it had during that year.[6]
 
 
 9
 In a later ruling (on March 5, 1986) the district court resolved additional motions for summary judgment concerning the meaning of various clauses in the insurance contracts and how defense costs should be apportioned among the insurance companies.
 
 
 10
 At this juncture LAQ and the insurance companies had already stipulated to LAQ's defense, settlement and damage costs as of December 31, 1983 arising out of the many suits against it, and no dispute had arisen over costs arising out of suits that LAQ had settled after that date. The only issue that remained to be adjudicated under the district court's legal framework was the injury manifestation date of many of those who had sued LAQ; under the court's prior rulings, an insurance company was not responsible for claims arising out of injuries which manifested themselves before the date it issued its insurance policy to LAQ. While LAQ had proffered a list of manifestation dates for each claimant, the insurance companies had not yet engaged in sufficient discovery to assess the accuracy of LAQ's list. The district court's March 5 order permitted the insurance companies additional time to engage in discovery.
 
 
 11
 On April 3, 1986 the Supreme Court of New York ordered Midland into insolvency proceedings pursuant to New York's Uniform Insurers Liquidation Act. In re Corcoran (Midland Insurance Co.), No. 86-41294 (N.Y.Sup.Ct. April 3, 1986). The Supreme Court's order declared Midland insolvent and appointed New York's Superintendent of Insurance as statutory receiver. The court did not, however, extinguish Midland's corporate existence. The corporate charter, like Midland's other assets, was vested in the Superintendent as liquidator. The court also enjoined all suits against Midland:
 
 
 12
 all ... persons, including ... claimants [and] plaintiffs ... who have claims against MIDLAND, are permanently enjoined and restrained from bringing or further prosecuting any action ... against [Midland] or its estate, or the Superintendent ... as Liquidator thereof, or from ... in any way interfering with the Superintendent ... in the discharge of his duties as Liquidator thereof, or in the liquidation of the business of [Midland].
 
 
 13
 Id. at 7-8. The court order established April 3, 1987 as the last date for submitting claims against Midland to the liquidator. The court retained continuing jurisdiction over the liquidation proceeding. The Supreme Court's order also restrained all "agents" of Midland from taking further steps on its behalf.
 
 
 14
 On May 30, 1986, the Superintendent gave Midland's prior counsel limited authority to move to dismiss LAQ's claim against Midland in the district court action. On June 30, 1986, Midland filed a motion in the district court to dismiss or alternatively to stay the action against it, arguing that the district court should abstain and that it owed full faith and credit to the New York injunction.
 
 
 15
 The district court addressed Midland's motion in an opinion filed on November 10, 1986. Noting that it had the power to hear the case in personam despite the state court injunction, the district court addressed the question of abstention. The court reasoned that a declaratory judgment against Midland would not sufficiently disturb the state court proceedings to warrant abstention:
 
 
 16
 [No] determination by this court will be disruptive of state efforts to establish a coherent policy with respect to Midland's liquidation. The Liquidator of Midland is in essence charged with sorting out all claims against it and processing them for full or, more likely, partial payment. In this case, I will merely be clarifying Midland's legal obligation for policies it issued to LAQ when interpreted in conjunction with other policies issued to the other named defendants. LAQ will be forced to take whatever declaratory judgment it receives in the instant case and seek the actual money from the Liquidator.... [T]he determination in this case will not affect the authority of the Liquidator but will only clarify the amount of any claims LAQ may have against Midland.... This court is concerned with the abstract notion of how much liability Midland has under certain policies. The state proceeding is concerned with how much LAQ, in light of Midland's financial plight, can collect.
 
 
 17
 Dist.Ct.Op. at 8-11 (Nov. 10, 1986). Finding the abstention doctrines of neither Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), nor Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), applicable, the district court denied Midland's motion.
 
 
 18
 On March 4, 1987, the Court filed an opinion with accompanying order reaffirming its previous decisions and entered a final judgment pursuant to Fed.R.Civ.P. 54(b).[7] The court ordered Midland to pay damages totalling $6,219,636, "representing $3,321,800 in settlements incurred between February 1985 and June 1986, plus $2,897,836 in defense costs attributable to those settlements." Dist.Ct.Op. at 11 (March 4, 1987). Although the district court also ordered judgment against AHAC and Highlands, it granted Midland 28 days to review the reasonableness of the claims assessed against it because Midland had not yet approved LAQ's proffered list of asbestos injury manifestation dates. The court stated that Midland would be granted time beyond the 28 day period "on a showing by Midland, which will bear the burden of proof on such an application, that the charges assigned to it are probably unreasonable." Id. at 12. On March 9, 1987, the Superintendent of Insurance gave Midland's counsel authority to proceed with discovery to allow it to assess the accuracy of the manifestation dates.
 
 
 19
 On April 2, 1987, after the 28-day period expired, the district court entered a money "judgment for damages" against "Midland ... or its successors or representatives" for $6,219,636, but granted Midland 10 days to make a motion for reconsideration. Midland did so and repeated its argument that many of the claims assigned to its policy involved asbestos injuries that had manifested before its policy took effect. Midland argued that even under the continuous trigger theory, manifestation of asbestos injury constituted the last possible occurrence that could trigger coverage, and hence that Midland was not responsible for indemnifying LAQ for these claims.
 
 
 20
 Midland also asserted that its liquidation status, its (alleged) failure to receive notice from the district court, and LAQ's (alleged) failure to answer interrogatories severely handicapped its efforts to examine individual claims. Midland further argued that, despite these impediments, its random review of files created a material question of fact. Finally, Midland argued that the district court's money judgment was inconsistent with the court's November 10, 1986 opinion stating that it intended to render only a declaratory judgment, and that the inclusion of the terms "or its successors or representatives" in the judgment purported to bind the liquidator to pay LAQ the entire amount of damages, also in contravention of the November 10, 1986 opinion.
 
 
 21
 On May 19, 1987, the district court denied Midland's motion for reconsideration pursuant to Fed.R.Civ.P. 59(e). With respect to the issue whether the judgment ran against Midland's successors or representatives, the court stated, without explanation, that it had "been advised by counsel that they have amicably resolved any dispute regarding the phrase 'or its successors or representatives.' " Dist.Ct. Order at 3 (May 19, 1987). Midland appealed. LAQ has settled with Highlands and AHAC, so the only party left in the action is Midland.
 
 
 22
 Midland advances numerous contentions on appeal. Midland challenges the appropriateness of a suit against a liquidated insurer. It raises questions of abatement, abstention, full faith and credit and whether, given our obligation to apply state substantive law, the district court should have proceeded if the New Jersey state courts would not have. In addition, Midland attacks (1) the district court's adoption of the continuous trigger theory; (2) the court's rulings on joint and several liability; (3) the court's method of allocating defense costs; (4) the proration of Highlands' insurance obligations; and (5) the grant of summary judgment as to LAQ's final liability despite the existence of questions as to the manifestation dates of some of the asbestos injuries.
 
 
 23
 Because we conclude that the district court should have abstained from the action against Midland after the New York Supreme Court's liquidation order, we need not reach many of the unsettled questions of state contract law presented for our review, including the continuous trigger issue. We confine our discussion to whether the district court should have abstained under the Burford doctrine after the liquidation order.
 
 
 24
 II. THE STATUTORY FRAMEWORK OF INSURANCE LIQUIDATION PROCEEDINGS
 
 
 25
 The core of the Burford abstention doctrine, as discussed in the next section, is that federal courts should avoid needless disruption of an important, complex state regulatory system. To adjudicate this issue, we must analyze how New York's regulatory scheme works.
 
 
 26
 It is useful to commence our discussion of insurance regulation with the McCarran-Ferguson Act, 15 U.S.C. Secs. 1011-15 (1982), enacted by Congress in 1945 to reverse the Supreme Court's application of the Sherman Act to insurance companies in United States v. South-Eastern Underwriters Association, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). Section 1 of the Act declares that state regulation of the "business of insurance is in the public interest." 15 U.S.C. Sec. 1011. Section 2 declares that the "business of insurance ... shall be subject" to state laws relating to the "regulation ... of such business." 15 U.S.C. Sec. 1012(a). This affirmative declaration frees state insurance regulation from the negative force of the dormant commerce clause, which normally invalidates state laws that materially burden interstate commerce. See Prudential Insurance Co. v. Benjamin, 328 U.S. 408, 429, 66 S.Ct. 1142, 1155, 90 L.Ed. 1342 (1946) ("Obviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance."). Section 2 also states that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance." 15 U.S.C. Sec. 1012(b). This section frees insurance companies from federal antitrust regulation under the Sherman Act and other statutes. The McCarran-Ferguson Act does not specifically address state regulation of insurance liquidation, but then it does not speak specifically to any aspect of state regulation of insurance. Rather than prescribing specific substantive or procedural rules, the Act allocates power in the federal system.[8]
 
 
 27
 In the absence of the type of comprehensive federal regulation over insurance accorded the banking, securities and commodities industries, and because of the exclusion of insurance companies from the operation of federal bankruptcy law, 11 U.S.C. Sec. 109, the states have assumed the primary role in regulating insurance. New York, for example, has a comprehensive insurance code which establishes a Superintendent of Insurance to review annual financial statements, prevent insurance fraud, license insurers, regulate insurance rates, delineate fair methods of competition, proscribe unfair claim settlement practices and administer an insurance scheme to protect those injured by insurance company insolvencies. N.Y.Ins. Secs. 307, 401-408, 1101-1116, 2301-2409, 2601-2610, 7601-7614 (McKinney 1985 & Supp.1988). In particular, New York, like thirty-one other states, has substantially adopted the provisions of the Uniform Insurers Liquidation Act. See 13 Uniform Laws Annotated at 15 (Master ed. Supp.1988).
 
 A. Nuts and Bolts of the Uniform Act
 
 28
 The Superintendent of Insurance in New York monitors the financial health of all domestic insurance companies. The Superintendent may seek a liquidation or other appropriate order in a specified district of the New York Supreme Court. N.Y.Ins. Secs. 7417, 7421. Grounds for a liquidation order include insurer insolvency, refusal to cooperate in the Superintendent's regulatory oversight, or a finding that further transaction of business will be hazardous to policyholders, creditors or the public. Id. Secs. 7404, 7402. The liquidation order directs the Superintendent to take possession of the insurer's property and to liquidate the business.
 
 
 29
 The court may direct the Superintendent to manage the insurer's property in the insurer's name or in the name of the Superintendent. The order vests the Superintendent with title to all of the insurer's property and rights to all of the insurer's contracts and rights of action, excluding assets located in reciprocal states that have appointed ancillary receivers. Id. Secs. 7405, 7410(b). A reciprocal state is defined as a state (other than New York) "in which in substance and effect the provisions of the [Uniform Act] are in force...." Id. Sec. 7408(b)(6). After ordering the insurance company into liquidation, the court maintains continuing jurisdiction over the liquidation proceedings to ensure that the Superintendent's office properly discharges its duties.
 
 
 30
 When issuing the liquidation order or at any time thereafter, and after an appropriate hearing, the Supreme Court may issue an order declaring the insurer insolvent. Id. Sec. 7432(a). The court may also dissolve the corporate existence of the insurer if certain statutory stated grounds for such an action are present. Id. Sec. 7416. In addition, the court may enjoin the insurer or its agents from interfering with the Superintendent's liquidation and may issue
 
 
 31
 such other injunctions or orders as it deems necessary to prevent interference with the superintendent or the proceeding, or waste of the assets of the insurer, or the commencement or prosecution of any actions, the obtaining of preferences, judgments, attachments or other liens, or the making of any levy against the insurer, its assets or any part thereof.
 
 
 32
 Id. Sec. 7419(b).
 
 
 33
 While the liquidator is collecting the assets of the insurer and protecting the insurer's estate from suits, the liquidator also processes claims made against the insurer's estate. The Act provides that all persons who may have claims against an insurer in liquidation shall present them to the liquidator within four months from the date of the entry of the liquidation order or within such longer time as the court shall prescribe. Id. Sec. 7432. Claims of non-residents may be filed with an ancillary receiver in a reciprocal state. Id. Secs. 7411, 7412. The liquidator's decision to accept or reject a claim is reviewed by the court overseeing the liquidation proceeding. Id. Sec. 7428.
 
 
 34
 New York also operates the Property/Casualty Insurance Security Fund to protect insureds from the potentially devastating effect of a shortfall in the satisfaction of their claims against the insurer. In New York, the fund does not independently process or pay out claims. The fund is used only to pay claims "allowed by the court in a [liquidation] proceeding." Id. Secs. 7603, 7602(g). Payments are made by the liquidator. Id. Sec. 7608.
 
 B. The Purpose of the Uniform Act
 
 35
 The New York courts have expressed a strong commitment to preserving the independence of insurance liquidation proceedings from outside interference. This policy of noninterference has been held necessary for the proceedings to achieve their purpose of protecting the insurer's creditors and the public.
 
 
 36
 According to the New York Court of Appeals, "the dominant purpose" of New York's insurance insolvency law is "the preservation and enhancement of that company's assets to the end that the interests of all its creditors, policyholders, stockholders and the public will be subserved." In re Knickerbocker Agency, 4 N.Y.2d 245, 253, 149 N.E.2d 885, 890, 173 N.Y.S.2d 602, 609 (1958) (declining to give effect to an arbitration clause in a contract between an insurer in insolvency proceedings and its agents). The Court of Appeals explained that the liquidation proceeding
 
 
 37
 is intended to and does furnish a 'comprehensive, economical, and efficient method for the winding up of the affairs' of ... insurance companies by the Superintendent of Insurance. [The liquidation] provisions of the Insurance Law 'are exclusive in their operation and furnish a complete procedure for the protection of the rights of all parties interested.' ... The Supreme Court, in the liquidation proceeding, must take cognizance of the interests of the policy-holders, creditors, stockholders, and the public, and it may issue such orders 'as may be deemed necessary to prevent interference with the superintendent or the proceeding, or waste of the assets of the insurer.' Clearly does the plan emerge that the Supreme Court, with the agency of the Superintendent of Insurance, was intended to have exclusive jurisdiction of claims both for and against an insurance company in liquidation.
 
 
 38
 4 N.Y.2d at 250, 149 N.E.2d at 889, 173 N.Y.S.2d at 606-07 (citations omitted).
 
 
 39
 New York's policy is best illustrated by the Court of Appeals' decision in G.C. Murphy Co. v. Reserve Insurance Co., 54 N.Y.2d 69, 429 N.E.2d 111, 444 N.Y.S.2d 592 (1981). The court unanimously held that the Uniform Insurers Liquidation Act required a creditor seeking reimbursement under a New York insurance contract to pursue its claim in liquidation proceedings in Illinois. The case involved a state, Illinois, which had adopted the Uniform Act, an Illinois insurance company and an Illinois court order sending the insurer into liquidation proceedings six years after the commencement of the insured's litigation in the New York courts. The court did not hesitate, however, to stay the suit and send the insured to seek relief in the Illinois liquidation proceeding:
 
 
 40
 We are ... cognizant of the individual hardship suffered by the present plaintiff, who has been in the throes of litigation for the past seven years and now must pursue its claim in the distant forum of Illinois. By enacting the Uniform Insurers Liquidation Act, our Legislature has determined that such occasional instances of adversity are outweighed by the paramount interest of the various States in seeing that insurance companies domiciled within their respective boundaries are liquidated in a uniform, orderly and equitable manner without interference from external tribunals.
 
 
 41
 54 N.Y.2d at 80-81, 429 N.E.2d at 117, 444 N.Y.S.2d at 598.[9]
 
 
 42
 New York has thus adopted a complex and thorough regulatory scheme to liquidate insolvent insurers. And the New York courts, the primary expositors of New York law in our federal system, have identified a strong New York regulatory policy that the liquidation of insolvent insurers can best be accomplished through noninterference by outside courts. Against this background, we turn to the abstention issue.[10]III. BURFORD ABSTENTION
 
 
 43
 A. The Character of the District Court's Order
 
 
 44
 It is first useful to determine the character of the order that we are reviewing. Although the language of the April 2 order itself states that it is a money judgment rather than a declaratory judgment, we construe the district court's judgment as declaratory.
 
 
 45
 We are persuaded that the district court intended its April 2 judgment to be declaratory because only this reading makes the judgment consistent with the district court's earlier and still efficacious opinions in the case. As noted supra at 1037, the basis for the district court's November 10, 1986 denial of Midland's motion for abstention or stay was that it would only be issuing a declaratory judgment that could be taken by LAQ to receive cents on the dollar in the New York liquidation proceeding. If we construed the district court's judgment as monetary, and we upheld the judgment after reaching the merits, LAQ would have the right to execute on the full $6,219,636 judgment directly against Midland, bypassing the liquidation proceeding. This result would vitiate the district court's November 10, 1986 opinion and its rationale for declining to abstain, even though the district court's subsequent opinions never questioned or even addressed the issues discussed in its abstention opinion. This result would also work a manifest unfairness to Midland's other creditors, whose claims in the liquidation proceedings would be automatically subordinated to LAQ's judgment. That the district court intended these results through its April 2 judgment seems most unlikely.
 
 
 46
 These considerations lead us to conclude that we are reviewing a declaratory judgment.[11]B. The Burford Abstention Doctrine
 
 
 47
 In Burford the Supreme Court reinstated the district court's dismissal of an action brought to enjoin enforcement of a Texas Railroad Commission order granting Burford a permit to drill four oil wells. The Court held that the district court had acted within its equitable discretion in dismissing the action without reaching the merits even though the action fell within its diversity and federal question jurisdiction.
 
 
 48
 The Court emphasized that the regulatory scheme in Burford, effected to exploit the vast Texas oil fields efficiently and to protect landowners from having the oil beneath their land drained by adjoining drillers, was a particularly difficult state problem with which the state legislature had wrestled extensively. The factual and legal issues and the regulatory scheme were intricate, complex, and unique to the state. The Supreme Court noted that the Texas courts were "working partners with the Railroad Commission in the business of creating a regulatory system for the oil industry"; that the state courts provided "thorough judicial review" of Commission orders; and that "[t]o prevent the confusion of multiple review of the same general issues, the legislature provided for concentration of all direct review ... in the State district courts of Travis County." Burford, 319 U.S. at 325-26, 63 S.Ct. at 1103. As a result of their participation, state courts, like the regulatory agency itself, had developed the "specialized knowledge which is useful in shaping the policy of regulation of the ever-changing demands in this field." Id. at 327, 63 S.Ct. at 1104. The Court also observed that jurisdiction over these cases engendered incursion into unsettled areas of state law. Id. at 331, 63 S.Ct. at 1106. The Court concluded that federal court participation in this integrated state scheme would only cause confusion and that "[a]s a practical matter, the federal courts can make small contribution to the well organized system of regulation and review which the Texas statutes provide." Id. at 327, 63 S.Ct. at 1104.
 
 
 49
 Subsequent opinions of the Supreme Court have made clear that the maze of factors warranting abstention in Burford need not each be present to warrant abstention under the doctrine. As read in subsequent cases, Burford stands for the proposition that where a state creates a complex regulatory scheme, supervised by the state courts and central to state interests, abstention will be appropriate if federal jurisdiction deals primarily with state law issues and will disrupt a state's efforts "to establish a coherent policy with respect to a matter of substantial public concern." Colorado River, 424 U.S. at 814, 96 S.Ct. at 1245; see also United Services Automobile Association v. Muir, 792 F.2d 356, 364 (3d Cir.1986) ("Generally, Burford abstention is justified where a complex regulatory scheme is administered by a specialized state tribunal having exclusive jurisdiction."), cert. denied, 479 U.S. 1031 (1987); 1A Moore's Federal Practice p 0.203, at 2140-41 (suggesting that courts have found the potential for disruption alone provides the litmus test for abstention under Burford ). But cf. Zablocki v. Redhail, 434 U.S. 374, 380 n. 5, 98 S.Ct. 673, 678 n. 5, 54 L.Ed.2d 618 (1978) ("[T]here is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy.").
 
 
 50
 While courts have identified the likelihood that federal adjudication would disrupt an important and complex state regulatory scheme as the preeminent consideration in deciding whether Burford abstention is appropriate, one additional factor has also come into prominence: federal courts more readily abstain from a case that contains no issue of federal law. See Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 26, 103 S.Ct. 927, 942, 74 L.Ed.2d 765 (1983) ("[T]he presence of federal-law issues must always be a major consideration weighing against surrender" of jurisdiction.); Izzo v. Borough of River Edge, 843 F.2d 765, 768 (3d Cir.1988) ("[I]n the years since Burford the presence of a federal issue has become a significant element in deciding whether a court should abstain.").[12]
 
 
 51
 The Burford opinion relies, in part, on the traditional discretion of a "federal equity court ... 'to enforce or protect legal rights, the exercise of which may be prejudicial to the public interest.' " Burford, 319 U.S. at 317-18, 63 S.Ct. at 1099 (quoting United States v. Dern, 289 U.S. 352, 360, 53 S.Ct. 614, 617, 77 L.Ed. 1250 (1933)). The question this raises is whether Burford abstention is appropriate in a case, like the one at bar, where the court is not being asked to provide equitable relief.
 
 
 52
 In its comprehensive restatement of abstention doctrine in Colorado River, the Supreme Court failed to mention the relevancy of equitable relief in describing the reach of Burford. Of greater importance, however, is that the central concern animating the Court's decision to abstain in Burford--preventing the state regulatory scheme from needless disruption--simply does not depend on whether the relief sought by the plaintiff is properly characterized as legal or equitable. If the relief sought is legal and the disruption is of the extent and character suggesting that Burford abstention is appropriate, a refusal to abstain simply because the federal court is not sitting as a court of equity makes no sense.
 
 
 53
 Moreover, the Supreme Court has unequivocally moved away from the distinction between legal and equitable relief with respect to its other abstention doctrines. See Colorado River, 424 U.S. at 817, 96 S.Ct. at 1246 (abstention on grounds of wise judicial administration appropriate in a case involving declaratory relief); Fornaris v. Ridge Tool Co., 400 U.S. 41, 43-44, 91 S.Ct. 156, 157-58, 27 L.Ed.2d 174 (1970) (abstention to avoid adjudication of constitutional question appropriate in a case involving money damages); United Gas Pipe Line Co. v. Ideal Cement Co., 369 U.S. 134, 135-36, 82 S.Ct. 676, 677, 7 L.Ed.2d 623 (1962) (same); Clay v. Sun Insurance Office Ltd., 363 U.S. 207, 212-13, 80 S.Ct. 1222, 1226, 4 L.Ed.2d 1170 (1960) (same); Fair Assessment in Real Estate Association v. McNary, 454 U.S. 100, 116, 102 S.Ct. 177, 186, 70 L.Ed.2d 271 (1981) (principle of comity bars taxpayers' damage actions brought in federal courts under 42 U.S.C. Sec. 1983 to redress the allegedly unconstitutional administration of state tax system); Deakins v. Monaghan, 484 U.S. 193, 108 S.Ct. 523, 530, 98 L.Ed.2d 529 (1988) (upholding Third Circuit rule staying Sec. 1983 damage suits pending resolution of state criminal proceedings involving Sec. 1983 suit issues); Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 28, 79 S.Ct. 1070, 1072, 3 L.Ed.2d 1058 (1959) (abstaining in a case involving the eminent domain power and noting that the abstention cases do "not apply a technical rule of equity procedure[,] ... [but] reflect a deeper policy derived from our federalism.").[13]
 
 
 54
 Because these cases suggest that the distinction between legal and equitable relief is no longer important in the abstention context, we conclude that Burford abstention is appropriate in cases seeking declaratory relief, even though such relief does not fall within the traditional boundaries of equity jurisdiction.[14]
 
 C. Applying the Burford Doctrine
 
 55
 Our analysis must begin with the proposition that the regulation of insurance companies unable to meet their obligations entails the type of strong state interest in which application of Burford abstention is appropriate. Like the valuable natural resource involved in Burford, solvent and healthy insurance coverage is an essential state concern. The McCarran-Ferguson Act specifically provides that it is in the public interest for states to continue serving their traditional role as the preeminent regulators of insurance in the federal system and indicates the special status of insurance in the realm of state sovereignty. Levy v. Lewis, 635 F.2d 960, 963-64 (2d Cir.1980). As discussed above, New York has enacted a detailed, complex scheme in this area.
 
 
 56
 Furthermore, it is clear that the very type of "partnership" discussed in Burford exists between the New York state courts and the Superintendent of Insurance. The New York courts issue the orders of liquidation, enjoin suits against the liquidator to protect the proceedings, and oversee the liquidator's assessment of claims against the insurer's estate.
 
 
 57
 In these circumstances, assumption of jurisdiction by the federal court in a suit against an insolvent insurer in liquidation proceedings would be highly destructive of the state's regulatory scheme. As the Second Circuit recognized in holding that Burford abstention is appropriate in such a circumstance, the "structure of the New York system serves the state's strong interest in centralizing claims against an insolvent insurer into a single forum where they can be efficiently and consistently disposed of." Law Enforcement Insurance Co. v. Corcoran, 807 F.2d 38, 44 (2d Cir.1986), cert. denied, 481 U.S. 1017, 107 S.Ct. 1896, 95 L.Ed.2d 503 (1987). One of the chief purposes of New York's regulatory scheme would be lost if an insurer in liquidation had to dissipate its funds defending unconnected suits across the country.
 
 
 58
 As the New York Court of Appeals held in In re Knickerbocker Agency, 4 N.Y.2d 245, 149 N.E.2d 885, 173 N.Y.S.2d 602 (1958), mandating that claims against an insolvent insurer be resolved in the liquidation proceedings enhances the delicate process of weighing competing claims to a limited fund. We can assume that Midland, like most insurance companies, issues policies containing identical terms to a large number of insureds. Absent the prospect of competing adjudications racing to judgment, the liquidator, subject to full review by the New York court system, is able to interpret these identical provisions in a manner permitting the fair and equitable distribution of assets to all of the insureds. While our federal system does not ordinarily ensure that courts interpret identical provisions of an insurer's policies consistently, consistent interpretation in the insurance liquidation context is much more important than it is usually because payments made to one claimant are frequently facilitated by reducing distributions to other claimants.
 
 
 59
 In the instant case, given the uncertainty that has divided the courts over the continuous trigger theory, see note 5 supra, and the difficulty of the question, the risk is not insubstantial that the Superintendent, reviewed by the New York state courts, would adopt a different interpretation than did the district court. Were the liquidator to construe Midland's insurance contracts more favorably to Midland than did the district court, LAQ would not only receive more on its claim than other similarly situated claimants; given the limited availability of funds, LAQ's higher return would be funded by reducing their awards. Thus the fact that the New Jersey federal court would only fix the amount of the claim and not directly insinuate itself into the allocation of claim payments from the assets of the liquidated company is irrelevant.
 
 
 60
 Other considerations of New York policy warrant respect for New York's liquidation proceedings. When an insurance company goes into insolvency proceedings, it necessarily disrupts the proper management of the company's litigation. Management of the company is wrenched from the company's executives and placed in the liquidator. The liquidator must immediately assume control of the company, become familiar with its operations, devise an efficient and fair strategy for dismantling the company, and devise a plan for managing the company in the interim. Like the other decisions made by the insurer's prior executives, the management of the insurer's litigation must also be reevaluated.
 
 
 61
 The liquidation order abruptly uproots contracts previously entered into by the insurer in order to prevent the assets of the company from wasting away and to give the liquidator additional time in which to evaluate the proper course of action. In many cases, and the instant case is typical, the insurer's litigation counsel is abruptly deprived of authority to act for the insurer. Such deprivation causes immediate confusion in any litigation; in the instant case the authority of Midland's counsel to engage in necessary discovery was not restored until eleven months after the liquidation order. Although there is a dispute between the parties as to whether Midland did nonetheless have a fair opportunity to engage in discovery in this case, the confusion caused by the liquidation order must have had a deleterious effect on Midland's ability to defend itself adequately. Moreover, an insurer in liquidation may often have trouble retaining effective counsel in light of the uncertainty created as to payment of counsel fees.[15] Failure to defer to the state regulatory scheme would greatly exacerbate these problems.
 
 
 62
 Our conclusion that independent proceedings against an insurer placed into insolvency proceedings are highly disruptive to the state's regulatory scheme is buttressed by New York law itself. New York has a strong regulatory policy that the liquidation of insolvent insurers can best be accomplished by noninterference from outside courts. See supra at 1040-41. New York law provides that New York courts cannot allow an action to proceed against an insurer while the insurer is in insolvency proceedings, whether the proceedings are in New York or in any other state that has adopted the Uniform Act. See G.C. Murphy Co. v. Reserve Insurance Co., 54 N.Y.2d 69, 429 N.E.2d 111, 444 N.Y.S.2d 592 (1981). Moreover, the liquidating court is given the power to issue anti-suit injunctions, and the court did so in this case at the request of the Superintendent of Insurance. N.Y.Ins.Law Sec. 7419(b) (McKinney 1985). The issuance of the injunction by the court in this case indicates that both the Superintendent and the New York court believed that further maintenance of suits against Midland would be disruptive of the liquidation proceeding.[16]
 
 
 63
 Finally, we note that the case at bar does not require this Court to lay down a per se rule that district courts must always abstain from an action against an insurance company the instant a state court places the company in liquidation proceedings. The decision as to whether abstention is appropriate may require an inquiry into the facts of the specific case before the court.
 
 
 64
 We thus turn to the facts of the case before us. The state court ordered Midland into liquidation on April 3, 1986. It is at this point, or at least at the point the motion regarding abstention was filed on June 30, 1986, from which we must evaluate the district court's decision not to abstain. The completion of the district court's work was still a year away and entailed additional discovery, hearings and briefing. While the district court could not have known precisely how long the litigation would run, it was clear that the litigation would continue for some time. While the extent of discovery between LAQ and Midland prior to the April 3 order is unclear from the record, the materials already discovered could be used to litigate the case in the New York courts. Moreover, the instant case exclusively involves issues of state law, which weighs in favor of abstention.
 
 
 65
 While LAQ will no doubt find it inconvenient to start from the beginning in another tribunal, there can be no guarantee that, were we to reach the merits of this case, it would not have to start over again anyway. Moreover, we must consider the effect of the decision in this case on future cases involving insurance liquidation proceedings. While the confluence of the issues in the suit against Midland and the suits against AHAC and Highlands in the district court would have made abstention less of a time-saver for the district court than would otherwise be the case, the fact that LAQ was also suing two other companies does not make the suit against Midland any less disruptive of the state liquidation proceeding.[17]
 
 
 66
 We review the district court's failure to abstain under Burford for abuse of discretion.[18] We conclude, however, that Burford abstention was so clearly warranted on the facts of this case that we must reverse the district court's decision not to abstain. New York's interest in its regulatory scheme is strong. The scheme creates a partnership between the New York courts and the Superintendent of Insurance. New York law requires that claims against insolvent insurers be processed in the liquidation proceedings. And the cogent reasons why New York has adopted such a regulatory policy--equitable adjustment of claims, reduction of administrative costs, proper management of the insolvent insurer's liabilities--attest to the disruptive effect of the district court's refusal to abstain. Finally, the facts of the instant case fail to undermine reliance on any of these more general considerations.
 
 
 67
 We note that most courts that have discussed this question have held abstention and stay or dismissal appropriate in the circumstance of a suit against an insurer in liquidation proceedings. See Grimes v. Crown Life Insurance Co., 857 F.2d 699, 706 (10th Cir.1988) (reversing district court for failing to abstain under Burford ); Law Enforcement Insurance Co., 807 F.2d at 44 (affirming district court abstention); Brown v. Link Belt Division of FMC Corp., 666 F.2d 110, 115 (5th Cir.1982) (same); Independent Petrochemical Corp. v. Aetna Casualty & Surety Co., 672 F.Supp. 1, 6 (D.D.C.1986) (abstaining); Aims Enterprises, Inc. v. Muir, 609 F.Supp. 257, 261-62 (M.D.Pa.1985) (same); Metropolitan Life v. Board of Directors, 572 F.Supp. 460, 473 (W.D.Wis.1983) (same); Mathias v. Lennon, 474 F.Supp. 949, 955 (S.D.N.Y.1979) (same); In re Cash Currency Exchange, Inc., 762 F.2d 542, 556 (7th Cir.1985) (dictum) (abstention appropriate). Cf. Brandenburg v. First Maryland Savings and Loan, Inc., 660 F.Supp. 717, 734 (D.Md.1987) (Burford abstention appropriate in state bank receivership); Stoller v. Baldwin-United Corp., [1984 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 91,678, at 99,430 (S.D. Ohio Sept. 19, 1984) (Burford abstention not appropriate because suit involved federal law). Contra Slotkin v. Brookdale Hospital Center, 357 F.Supp. 705, 708 (S.D.N.Y.1977) (declining to abstain); Arch Opening Steel Buck Corp. v. United Bonding Insurance Co., 336 F.Supp. 691, 693 (E.D.Pa.1972) (district court refused to respect liquidator's injunction and proceeded with suit without discussing abstention), aff'd without opinion, 475 F.2d 1394 (3d Cir.1973); In re Texas Turn-Key Operators, Inc., 70 B.R. 193, 196 (Bankr.S.D.Tex.1986) (declining to abstain in interpleader action).[19]
 
 
 68
 Because we hold that the district court should have abstained under the Burford doctrine, we do not reach the issue of whether abstention would have been appropriate under Colorado River, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483. Nor do we reach the interesting question whether a New Jersey federal court sitting in diversity must defer to the New York liquidation proceeding because that is what a New Jersey state court would do.[20]
 
 V. CONCLUSION
 
 69
 Because the district court should have abstained under the Burford doctrine in favor of the liquidation proceeding in the New York Supreme Court, the district court's judgment against Midland will be vacated and the case remanded for the district court to dismiss the suit against Midland. See Baltimore Bank for Cooperatives v. Farmers Cheese Cooperative, 583 F.2d 104, 108-09 (3d Cir.1978) (dismissal rather than retention of jurisdiction pending state determination is usually appropriate under Burford ).
 
 
 
 *
 The Honorable Norma L. Shapiro, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The parties have stipulated that as of December 31, 1983, LAQ had dealt with more than 4500 claims for personal injury and six lawsuits for asbestos-related property damage and had incurred approximately $4.5 million in settlement costs and $11.2 million in expenses (including legal fees)
 
 
 [2]
 LAQ did not sue Canadian General because LAQ had permitted it to purchase back its policies for the years 1962 through 1976 for approximately $1.7 million
 
 
 [3]
 The parties stipulated for the purposes of this litigation to the dangers of asbestos. Specifically they endorsed the description of asbestosis and mesothelioma in Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076, 1083-85 (5th Cir.1973) (explaining that exposure to asbestos can cause pleural thickening, pleural plaques and various forms of cancer and that although the fibers begin to damage the lungs shortly after inhalation these conditions manifest themselves long afterwards), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974)
 
 
 [4]
 LAQ argues on appeal that "manifestation" for purposes of the district court's coverage resolution means "last manifest development of disease." Midland urges a "first manifestation" interpretation
 
 
 [5]
 We shall refer to the theory of insurance coverage adopted by the district court as the continuous trigger theory. It is also widely known as the triple trigger theory. The district court expressly adopted the rationale of Keene Corp. v. Insurance Co. of N. America, 667 F.2d 1034, 1042-47 (D.C.Cir.1981) (applying continuous trigger), cert. denied, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982). Other courts have construed the insurance contract at issue here less favorably to the insured. See, e.g., Insurance Co. of N. America v. Forty-Eight Insulations, Inc., 633 F.2d 1212, 1225 (6th Cir.) (coverage triggered by a claim against insured if asbestos victim was exposed to the insured's asbestos during the policy period), clarified, 657 F.2d 814, cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); Porter v. American Optical Corp., 641 F.2d 1128, 1145 (5th Cir.) (same), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); Eagle-Picher Indus., Inc. v. Liberty Mutual Ins. Co., 682 F.2d 12, 19-25 (1st Cir.1982) (coverage triggered by a claim against insured if an asbestos disease has manifested itself during the policy period), cert. denied, 460 U.S. 1028, 103 S.Ct. 1279, 1280, 75 L.Ed.2d 500 (1983)
 
 
 [6]
 LAQ's election of the period March 15, 1975 to March 15, 1976 was with respect to asbestos-related personal injury claims against it only. With respect to absestos-related property damage claims, LAQ chose a period subsequent to Midland's insurance coverage. LAQ made this decision after reviewing risk-management considerations in light of the district court's endorsement of the continuous trigger theory. The district court's declaration of Midland's liability to LAQ thus includes amounts paid by LAQ for personal injury claims only
 
 
 [7]
 Citing the "unique facts of this case," the district court did, however, hold that because Highlands cancelled its insurance coverage after only six and one-half weeks, the continuous trigger approach would not be applied to Highlands. Rather than owing the full $20 million coverage of its policy, Highlands was responsible only for the prorated amount of $2.5 million ($20 million X 6.5/52 = $2.5 million). Dist. Ct. Determinations of Fact and Law at 9
 
 
 [8]
 Note should be taken that the Supreme Court has narrowly interpreted what constitutes the "business of insurance" within the meaning of the McCarran-Ferguson Act. See, e.g., Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). This narrow construction creates a question whether state regulation of insurer insolvencies constitutes regulation of the business of insurance within the meaning of the Act. Compare United Services Automobile Ass'n v. Muir, 792 F.2d 356, 364 (3d Cir.1986) (stating in dicta that such regulation is regulation of the business of insurance within the meaning of McCarran-Ferguson), cert. denied, 479 U.S. 1031, 107 S.Ct. 875, 93 L.Ed.2d 830 (1987) with Idaho ex rel. Soward v. United States, 858 F.2d 445 (9th Cir.1988) (holding that the Federal Insolvency Statute trumps Idaho law prioritizing claims in liquidation proceedings because the Idaho law does not regulate the business of insurance), corrected, No. 87-4057 (Sept. 29, 1988). In the case at bar, however, we are not wrestling with the question of whether a federal statute is preempted by the provision of McCarran-Ferguson stating that federal statutes may not impair the operation of state statutes regulating the business of insurance. Rather we must decide whether a federal court properly declined to abstain in favor of the state scheme. The McCarran-Ferguson Act seems relevant to this inquiry even if we are unconvinced that the Act preempts the federal statute extending diversity jurisdiction to the federal courts when it impairs state liquidation proceedings. Reliance on McCarran-Ferguson in the abstention context thus does not require us to discern whether state regulation of insurer insolvencies constitutes regulation of the business of insurance for other purposes
 
 
 [9]
 Other courts have also praised the operation of state liquidation proceedings and noted that the proceedings best effectuate their purpose of fairly and efficiently winding up the affairs of an insolvent company when free from the interference of outside courts. The Court of Appeals for the Seventh Circuit has explained that the
 states have a paramount interest in seeing that liquidation proceedings conducted by court-appointed liquidators and overseen by their courts are free from the interference of outside agencies. This interest is of even greater importance when the company undergoing liquidation is a domestic insurance company or other financial institution. The interests of the company's owners, policyholders, and creditors, as well as the public, are best served and protected by an orderly and efficient process of liquidation. The liquidation [of an insolvent insurer] is best left to a proceeding which will settle all of its affairs and dispose of all of its property. Federal courts should refrain from deciding select issues confronting another court in pending proceedings.
 Blackhawk Heating & Plumbing Co. v. Geeslin, 530 F.2d 154, 159-60 (7th Cir.1976) (citations and footnotes omitted) (dismissing for lack of jurisdiction an in rem suit to recover property held by the insurer's statutory liquidator despite the dispute's resolution after a lengthy trial). See also Motlow v. Southern Holding & Securities Corp., 95 F.2d 721, 725-26 (8th Cir.), cert. denied, 305 U.S. 609, 59 S.Ct. 68, 83 L.Ed. 388 (1938).
 
 
 [10]
 Our analysis proceeds on the understanding that the New York courts must give res judicata effect to the decision of the federal district court despite that court's failure to give full faith and credit to the state court's injunction. In Morris v. Jones, 329 U.S. 545, 67 S.Ct. 451, 91 L.Ed. 488 (1947), the Supreme Court held that the full faith and credit clause (art. IV, Sec. 1) required an Illinois court overseeing an insurance liquidation proceeding to accept a Missouri judgment as conclusive proof of the judgment creditor's claim. This was so even though the Missouri judgment was by default, was entered after the entry of an order by the Illinois liquidator staying all suits against the insurer, and a Missouri liquidator would not have had to give res judicata effect to the judgment. If a state court judgment has the power to bind under these circumstances, there can be no question that the federal district court's judgment must be given similar res judicata effect. See Restatement (Second) of Judgments Sec. 33 (1980); C. Wright, A. Miller & E. Cooper, 18 Federal Practice and Procedure Sec. 4472 (1981); Shapiro, State Courts and Federal Declaratory Judgments, 74 Nw. U.L.Rev. 759 (1979)
 The Court in Morris did not reach the question whether the full faith and credit clause required Missouri to respect the stay order of the Illinois liquidation court; the Court held that the appropriate place to raise the issue was before the Missouri court. 329 U.S. at 552, 67 S.Ct. at 456. The district court's decision to go forward in the face of the New York state court injunction, however, would not allow the state court to ignore the district court's judgment. Because the issue was fully litigated in the district court, a state court would be required to give res judicata effect to the district court's decision to assume jurisdiction even if the state court were to conclude that the district court's assumption of jurisdiction was erroneous. Cf. Stoll v. Gottlieb, 305 U.S. 165, 172, 59 S.Ct. 134, 138, 83 L.Ed. 104 (1938) (District court order releasing a guarantor of the debtor's bonds, even if entered without jurisdiction, was res judicata in a later action in a state court against the guarantor brought by a bondholder who had received notice of the district court's hearing and had later failed in a petition to the court to set aside its order for want of jurisdiction.); Durfee v. Duke, 375 U.S. 106, 111, 84 S.Ct. 242, 245, 11 L.Ed.2d 186 (1963) (A state court "judgment is entitled to full faith and credit--even as to questions of jurisdiction--when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment."); Currie, Full Faith and Credit, Chiefly to Judgments: A Role for Congress, 1964 Sup.Ct.Rev. 89, 101-02 (Even if state court errs in denying full faith and credit to another state court's judgment, the subsequent, erroneous state court judgment is entitled to full faith and credit.); Restatement (Second) of Judgments Sec. 87 (1982) ("Federal law determines the effects under the rules of res judicata of a judgment of a federal court.").
 Given our disposition of the case we need not decide whether the New York court's injunction is itself effective to bar this action. On the power of state courts to enjoin federal court actions, compare Donovan v. City of Dallas, 377 U.S. 408, 413, 84 S.Ct. 1579, 1582-83, 12 L.Ed.2d 409 (1964) (state courts without power to restrain federal court proceedings in in personum actions) with Colorado River, 424 U.S. at 818, 96 S.Ct. at 1246-47 (court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other courts).
 
 
 [11]
 Federal courts have discretion to decline to grant declaratory relief irrespective of the merits of the controversy before them. For an explication of the criteria to be used in exercising this discretion, see Brillhart v. Excess Ins. Co., 316 U.S. 491, 495, 62 S.Ct. 1173, 1175-76, 86 L.Ed. 1620 (1942) (whether proceeding in federal court would contribute to uneconomical concurrent litigation; whether federal law governs the action; whether the controversy can better be settled in state court); Interdynamics, Inc. v. Wolf, 698 F.2d 157, 167 (3d Cir.1982). The Original Committee Note of 1937 to Fed.R.Civ.P. 37 also states that "[a] declaration may not be rendered if a special statutory proceeding has been provided for the adjudication of some special type of case," although this rule has been held not to be absolute. 6A Moore's Federal Practice p 57.01 (2d ed.1987) (reproducing Committee Note); see Katzenbach v. McClung, 379 U.S. 294, 295-96, 85 S.Ct. 377, 379, 13 L.Ed.2d 290 (1964); E. Borchard, Declaratory Judgments 342-46 (2d ed.1941) (discussing special state and federal statutory proceedings within the ambit of the Committee Note). This Court reviews a district court's decision to reach the merits of a declaratory judgment action for abuse of discretion. Interdynamics, 698 F.2d at 167. Given our disposition of this case, we need not reach the question whether the New York liquidation proceeding constitutes a special statutory proceeding within the meaning of the Committee Note or apply the other criteria relevant to the exercise of discretion in this area. See Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, 509 n. 13, 92 S.Ct. 1749, 1756 n. 13, 32 L.Ed.2d 257 (1972) ("The question of abstention, of course, is entirely separate from the question of granting declaratory ... relief.")
 
 
 [12]
 One additional doctrinal point warrants brief discussion. As noted above, an additional factor identified in the Burford opinion as warranting abstention was the uncertainty of state law issues. The Supreme Court, however, has subsequently identified this concern, when not coupled with the goal of avoiding the resolution of unsettled constitutional questions, as falling within the abstention doctrine of Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959), rather than within the Burford doctrine. See Colorado River, 424 U.S. at 814, 96 S.Ct. at 1244-45 (Thibodaux abstention is appropriate "where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar."). That a court must resolve unsettled issues of state law is now relevant to the Burford analysis only if it is likely to disrupt the state's regulatory scheme. Because we dispose of the case on the basis of Burford, we need not decide whether the uncertainty surrounding the important issues of state insurance law would render abstention appropriate under Thibodaux. Although one might ideally weigh the elements of each of the Supreme Court's abstention doctrines on a single balance in deciding whether abstention was appropriate, the Court's opinion in Colorado River evinces a more discrete approach
 
 
 [13]
 Cf. Shapiro, Jurisdiction and Discretion, 60 N.Y.U.L.Rev. 543, 551-52 (1985) ("[I]t is hard to see why [abstention cases should be confined to actions in equity. It] makes little sense, especially in a merged system."); C. Wright, A. Miller & E. Cooper, 17A Federal Practice and Procedure Sec. 4241, at 17-18 (2d ed. 1988) ("The Court was right not to limit abstention to cases in equity. Considerations of federalism are at the heart of abstention. These considerations are too important to be made dependent on ancient distinctions about the powers of the several courts at Westminster Hall, and the ability of a federal court to defer to a state in a proper case ought not depend on whether the case is thought of as 'legal' or 'equitable.' ")
 
 
 [14]
 Declaratory relief in the federal courts was created by a June 14, 1934 act of Congress. See 6a Moore's Federal Practice p 57.02 (setting forth the history of the federal Declaratory Judgment Act now codified at 28 U.S.C. Secs. 2201, 2202). Because declaratory relief is not a common law action, and in light of the discussion in the text supra, our decision to apply the Burford doctrine to a case involving declaratory relief is not inconsistent with Baltimore Bank for Cooperatives v. Farmers Cheese Coop., 583 F.2d 104, 111 (3d Cir.1978) ("Burford ... was an equitable action to restrain the Texas Railroad Commission[;] ... [t]raditionally, abstention has been applied only in cases involving equitable relief. The district court ... impermissibly extended abstention to a common law action.")
 
 
 [15]
 We hasten to add that, fortunately, that has not occurred here. Indeed, the court acknowledges the vigorous and capable advocacy of the counsel for both Midland and LAQ
 
 
 [16]
 See J. Gavin, Competing Forums for the Resolution of Claims Against an Insolvent Insurer, Law and Practice of Insurance Company Insolvency 152 (ABA National Institute on Insurer Insolvency, 1986):
 A liquidator of an insolvent insurer is likely to find that, at the outset of insolvency proceedings, such insurer is defending a substantial number of actions in a number of different forums....
 In almost all cases, it will be in the estate's interest to obtain a stay or dismissal of such proceedings and to require such claims to be presented and determined in the liquidation proceedings.... [T]his result preserves the authority of the liquidation court and allows the liquidator and that court to apply their expertise to the issues presented. The liquidation of claims in the liquidation proceedings also avoids outside interference in the liquidation proceedings and the possibility of conflicting rulings, piecemeal litigation of claims and unequal treatment of claimants. Any such consolidation of claims would also obviate the delay, inefficiency and waste of assets which would occur if the estate were required to defend claims in any forum. The resolution of claims in one forum thereby promotes a fair, orderly, efficient and economical proceeding which benefits all policyholders and creditors.
 
 
 [17]
 One additional matter requires attention. LAQ argues in its brief that it intends to take the district court's judgment to the insurance guarantee funds of states such as New Jersey and Pennsylvania and that this provides another reason for affirming the district court's decision not to abstain. This argument is untenable. To the extent that LAQ is entitled to payment of claims from any of these funds, it certainly must do more than present the $6,219,636 judgment to these funds. Each of these guarantee funds only insures claims that, roughly speaking, have some connection to the state sponsoring the fund. See, e.g., N.J. Stat.Ann. Sec. 17:30A-5(d) (West 1985); 40 Pa.Stat.Ann. Sec. 1701.103(5) (Purdon 1971). Each of the funds will thus be interested in parsing LAQ's total claim against Midland to discern what part of it has a connection to its state. For LAQ to collect from the funds, therefore, it must break down the money judgment issued by the district court into pieces that fit the claim requirements of the state guarantee funds. This examination of individual claims may reopen issues resolved by the district court, regardless of whether we were to order abstention. Moreover, the issue under Burford is disruption of the state system of regulation, and New York has determined that it is disruptive for suits against insolvent insurers to continue outside of liquidation proceedings, notwithstanding the possibility that a judicial declaration of liability may be of some use in presenting claims to the insurance guarantee funds
 
 
 [18]
 The abuse of discretion standard appropriately balances the federalism concerns underlying Burford and the inconvenience to the appellee of having to start all over again. This Court has previously held that abuse of discretion is the appropriate standard when reviewing a district court's abstention under Burford. Kentucky West Virginia Gas Co. v. Pennsylvania P.U.C., 791 F.2d 1111, 1115 (3d Cir.1986)
 
 
 [19]
 No prior Third Circuit opinion has addressed this issue. Felmeister v. Office of Attorney Ethics, 856 F.2d 529 (3d Cir.1988) reviews our recent Burford cases. The case perhaps closest to the instant case, United Services Automobile Ass'n v. Muir, 792 F.2d 356 (3d Cir.1986), rejected Burford abstention where the issue was the preemptive effect of a federal statute with respect to whether an insurer could purchase a bank
 
 
 [20]
 The Uniform Insurers Liquidation Act mandates that a New Jersey state court send LAQ to the New York liquidation proceeding after a New York court placed Midland into liquidation proceedings (or to the ancillary receiver if one had been appointed in New Jersey). A New Jersey trial court has so construed the Act. Zullo Lumber v. King Constr., 146 N.J.Super. 88, 368 A.2d 987 (Law Div.1976); see also N.Y.Ins. Secs. 7411, 7412 (McKinney 1985) and G.C. Murphy Co. v. Reserve Ins. Co., 54 N.Y.2d 69, 429 N.E.2d 111, 444 N.Y.S.2d 592 (1981), discussed supra at 1040-41, 1042-43, and N.J.Stat.Ann. Secs. 17:30C-18, 17:30C-19 (West 1985) (cognate New Jersey provisions of the Uniform Act). We need not decide whether a federal district court sitting in diversity must respect New Jersey law in this respect